NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0793n.06

No. 10-2392

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| ALAN COLE, JORDAN COLE, VINCENT COLE, | ) | |
| | ) | |
| Plaintiffs-Appellees, | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF DEARBORN, EDWARD VILLEMAIRE, RICHARD MICHALSKI, RICHARD CONRAD, SERGEANT & OTHER UNKNOWN DEFENDANTS, | ) | O P I N I O N |
| | ) | |
| Defendants-Appellants. | ) | |

FILED

*Nov 28, 2011*

LEONARD GREEN, Clerk

BEFORE:    KEITH, SUTTON, and McKEAGUE, Circuit Judges.

**McKEAGUE, Circuit Judge.**  In this civil rights action, Plaintiffs-Appellees Alan Cole,

Jordan Cole, and Vincent Cole ("the Coles") claim that Defendant-Appellant Police Officers

("Defendants") used excessive force in apprehending them for questioning regarding an armed

robbery.  Defendants appeal the district court's denial of their motion for summary judgment on

qualified immunity grounds.  For the reasons that follow, we REVERSE in part and AFFIRM in part,

and REMAND to the district court for further proceedings in conformity with this opinion.

**I.  BACKGROUND**

On the evening of March 24, 2007, the Coles drove to Fairlane Town Center Mall (located

in Dearborn, Michigan), accompanied by their brother, Vincent Cole, and friend Antoine Badey, to

watch a movie at the Star Theater.  Vincent Cole wore a white hooded sweatshirt, while Alan Cole wore a blue jacket.  The group was joined by two females, and after seeing a movie they walked across the street to a TGI Friday's restaurant.  They arrived at the restaurant at approximately 9:55 p.m., but were refused service because some members of their group were under the age of twenty-one.  While the six of them walked from the restaurant back to the Coles' car, the group was confronted by the Dearborn Police.

At 10:05 p.m. on that same day, the City of Dearborn Police Department Dispatch received a call from Officer Kassim of the Fairlane Town Center Security Police.  Officer Kassim was reporting an armed robbery that allegedly took place in the parking lot of the theater.  Officer Kassim stated that the suspects were four black males, one wearing a white hooded sweater and one wearing a black jacket.  Officer Kassim also stated that one suspect possibly had a gun.

Officer Kassim told the dispatcher that he was watching the suspects walk through the parking lot near the mall's food court on the Fairlane Town Center's closed-circuit security camera system.  While still on the phone with the dispatcher, Officer Kassim stated that he watched the suspects meet with two females and continue to walk towards the bus stop located in the Fairlane Town Center's parking lot near the Star Theater.  Officer Kassim continued to give specific directions to the dispatcher in order to lead responding Dearborn police officers directly to the suspects.  The Dearborn Police Department's dispatch services relayed this information to all Dearborn police cars in the city.

The first responding officers were Defendant-officers Edward Villemaire and Richard Michalski.  The officers had received information about the armed robbery from the dispatcher on

their radio. The officers were informed of Officer Kassim's description of the suspects' physical appearance and location. Defendants Villemaire and Michalski ordered the suspects to make their hands visible and to lie down on the ground, and according to the Coles, they immediately complied. Defendants claim that the Coles and their companions did not immediately comply, but did so only after a period of 5–15 seconds, during which the officers issued several more verbal commands. At that point, the Coles and their companions laid down on the ground while making their hands visible. However, while the officers were securing the scene, Defendants contend that Vincent Cole began to slide his hands underneath his chest, stopping only after several additional verbal commands from the officers. According to the Coles, Vincent was moving his hands over his head in order to remove his hood, which was covering his head as he lay down. Defendants also state that the Coles and their companions were not actively resisting and were not physically aggressive.

Villemaire and Michalski began placing handcuffs on the suspects and frisking them for weapons as they lay on the ground. Other Dearborn police officers also arrived at the scene and assisted in this process. At that point, the Coles contend that Jordan Cole was asked where the gun was, and he purportedly told the officers that none of them had a gun. Alan Cole alleges that as he lay on his stomach with his chin on the ground, one of the officers stomped on his back and held his boot on his neck while another officer placed handcuffs on him, which caused a scrape on his chin. Alan Cole also alleges that one of the officers drove his knee into his back while applying handcuffs, and that the officer then dragged him to a police car. Jordan Cole alleges that, as he lay on the ground, an officer stomped on his lower back and left him handcuffed on the ground. Finally,

Vincent Cole contends that one of the officers deliberately and intentionally stepped on his hand and ground it into the cement, prompting one of the officers to ask him if he needed a bandage.

Defendant-Appellant Sergeant Richard Conrad contends that, by the time he arrived to the scene, the suspects had been handcuffed and separated from one another—some sitting on the ground in the parking lot, and some sitting in the back seats of police cars. The Coles have not contested this assertion, and have not identified Sergeant Conrad as one of the individuals who was on the scene when force was allegedly applied. Upon arriving to the scene, Sergeant Conrad instructed the officers to search the immediate area for the handgun reportedly involved in the armed robbery. After no handgun was found, Sergeant Conrad requested that the Fairlane Town Center Security Police bring the victims of the armed robbery to the scene of the stop in order to determine whether Plaintiffs were the actual perpetrators of the robbery. The victims told the officers that Plaintiffs were not the people who had robbed them. The Coles were then released from custody. The entire stop lasted between fifteen and twenty minutes.

Shortly after the incident, the Coles returned home and informed their mother, Adrian Dupree, what had occurred. According to Dupree, she observed that Jordan had a footprint on his shirt and Alan's chin was scraped and cut. Dupree also states: (1) Alan's neck was sore for 1 and 1/2 weeks; (2) Jordan's back was sore for a few days; and (3) she treated Alan's and Jordan's injuries with ice and moist heat. Both Jordan and Alan Cole allege that they experienced neck and back pain for a couple of weeks after the incident, and that this caused them to be absent from school and work, respectively. The Coles further allege that they consulted a doctor for treatment on March 24, 2007.

- 4 -

However, their medical records indicate that this visit may not have taken place until over two years after the incident.

The Coles filed suit under 42 U.S.C. § 1983 for unreasonable search and seizure and excessive force, and against Defendant City of Dearborn for municipal liability based on its alleged failure to train and supervise its officers. The district court found that Defendants were entitled to qualified immunity as to the unreasonable search and seizure claim, and granted summary judgment as to municipal liability. However, the district court denied summary judgment on the basis of qualified immunity as to the Coles' claim of excessive force. *Cole v. City of Dearborn*, 2010 WL 4260109 *7 (E.D. Mich. Oct. 22, 2010). Defendants appeal the denial of summary judgment on the basis of qualified immunity.

## I. ANALYSIS

We review the district court's denial of summary judgment *de novo*. *Harrison v. Ash*, 539 F.3d 510, 516 (6th Cir. 2008). Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Defendants bear the burden of showing the absence of a genuine issue of material fact as to at least one essential element of the Coles' claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Coles must then present sufficient evidence from which a jury could reasonably find in their favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We then consider whether, drawing all reasonable inferences in favor of the Coles, Defendants must prevail as a matter of law. *Harrison*, 539 F.3d at 516.

An order denying summary judgment on the basis of qualified immunity, to the extent it turns on a question of law, is an immediately appealable collateral order. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). Conversely, to the extent that the district court's denial of qualified immunity was based on a factual dispute, such a denial falls outside the narrow jurisdiction of this Court. *Harrison*, 539 F.3d at 516. It follows that our jurisdiction is limited to the question of whether the evidence, considered in the light most favorable to the Coles, meets the legal standard for overcoming summary judgment on the basis of qualified immunity.

In claims of excessive force, we employ a two-step inquiry to decide whether a defendant is entitled to qualified immunity:[1] "[a] defendant is entitled to qualified immunity on summary judgment unless the evidence, viewed in the light most favorable to the plaintiff, 'would permit a reasonable juror to find that (1) the defendant violated a constitutional right; and (2) the right was clearly established.'"[2] *Coble v. City of White House, Tenn.*, 634 F.3d 865, 870 (6th Cir. 2011) (quoting *Aldini v. Johnson*, 609 F.3d 858, 863 (6th Cir. 2010)).

---

[1]We note that, ordinarily, analysis of a qualified immunity claim would entail a third step, in which the Court would determine whether the plaintiff offered sufficient evidence to indicate that what the officers allegedly did was objectively unreasonable in light of a clearly established constitutional right. *E.g.*, *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003). However, in an excessive force case, the Court must decide that defendant's conduct was objectively unreasonable in order to find a constitutional violation. This renders the third step redundant. "Thus, qualified immunity in excessive force cases is a two-step analysis." *Grawey v. Drury*, 567 F.3d 302, 309 (6th Cir. 2009).

[2] As a result of the Supreme Court's decision in *Pearson v. Callahan*, 555 U.S. 223 (2009), we are no longer compelled to take up the qualified immunity considerations in the sequence described here, i.e., considering first whether the facts alleged make out violation of a constitutional right and then whether that right was clearly established at the time of defendant's alleged misconduct. *Id.* at 242.

**A. Constitutional Violation**

The Fourth Amendment governs law enforcement investigative seizures—even those that do not result in a prosecution—and protects individuals from excessive force during these encounters. *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006). We review the use of force for reasonableness, from the perspective of a reasonable law-enforcement officer at the scene. *Saucier v. Katz*, 533 U.S. 194, 209 (2001), *overruled in part by Pearson*, 555 U.S. at 242; *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). We also consider the non-exhaustive list of factors described in *Graham*, which are (1) the severity of the crime; (2) whether the suspect poses a threat to the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *See id.* at 396. This analysis is to be conducted objectively, under the totality of the circumstances. *Graham*, 490 U.S. at 397. Finally, our analysis must "allow[] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

We have repeatedly held that "the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law." *Baker v. City of Hamilton*, 471 F.3d 601, 607 (6th Cir. 2006) (denying qualified immunity where plaintiff was struck after surrendering to police); *see also, e.g.*, *Shreve v. Jessmine County Fiscal Court*, 453 F.3d 681, 687 (6th Cir. 2006) (finding it objectively unreasonable for an officer to strike and jump on a suspect who was already on the ground and "out of it" due to the officer's application of pepper spray). The reason for this is self evident: where a suspect is passive and compliant with police orders, force is unnecessary to

accomplish the officer's task, and thus is objectively reasonable. *See Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002) (stating that there is "simply no governmental interest in continuing to beat [plaintiff] after he had been neutralized, nor could any reasonable officer have thought there was").

Construing the evidence in the light most favorable to the Coles, the record indicates that by the time Defendants allegedly applied force against them, the Coles and their companions were laying passively on the ground. The Coles claim that Defendants applied force against them in the following ways: (1) stomping on Alan Cole's back and stepping on his neck, causing scrapes on his chin; (2) driving a knee into Alan Cole's back and dragging him to a squad car; (3) stomping on Jordan Cole's back; and (4) stepping on Vincent Cole's hand and grinding it into the ground. These allegations all come within the protective reach of the Fourth Amendment.

The factors laid out in *Graham* also point to a Fourth Amendment violation under these facts. Although the Coles were believed to have committed an armed robbery, which is a severe crime, the violent nature of that offense was mitigated by the group's passive, vulnerable position at the time that force was allegedly applied. Given the rapidly evolving nature of these events, Defendants may well have believed the Coles posed a threat because the officers were outnumbered. Defendants, however, failed to offer any reason why the amount of force allegedly employed here was required under these particular circumstances. It is not our role to speculate as to what might have prompted such a show of force. While Defendants do question the severity of the Coles' injuries, this goes to the issue of damages rather than the reasonableness of Defendants' use of force.

**B. Clearly Established**

For a right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand what he is doing violates that right." *Saucier*, 533 U.S. at 202. As a general matter, the right to be free from excessive force by law-enforcement personnel is a clearly established Fourth Amendment right. *Neague v. Cynkar*, 258 F.3d 504, 507 (6th Cir. 2001). The contours of that general right are dictated "in light of the specific context of the case" based on the behavior of both the officer and the suspect. *Saucier*, 533 U.S. at 201.

Here, the line of demarcation is well defined: once a suspect is passively complying with an officer's commands, that suspect has a clearly established right to be free from force beyond what is necessary to carry out the arrest. *E.g.*, *Baker*, 471 F.3d at 608. "Cases in this circuit clearly establish the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest." *Shreve*, 453 F.3d at 688. A reasonable officer would understand that, after compliance is secured and a threat is no longer posed, force should not be employed. *See Baker*, 471 F.3d at 608. Under the Coles' version of the events, Defendants had reason to know at a particularized level that the conduct they allegedly engaged in during this apprehension violated the Coles' Fourth Amendment rights.

As a general matter, the Coles plead facts that make out a Fourth Amendment violation because they were allegedly subjected to force after they had passively complied with Defendants' orders. Thus, a reasonable juror could find that the Coles had a clearly established right to be free from force at the time that excessive force was allegedly applied to them. We now test the Coles' claims with regard to each Defendant individually.

## C. Liability of Individual Officers

Although the district court concluded, as we have, that the Coles have alleged sufficient facts to overcome qualified immunity on summary judgment, that court neglected to apply its analysis to each of the officers involved and consider their individual liability. *See Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010). Accordingly, we now assess each defendant's liability in turn. "As a general rule, mere presence at the scene of [the alleged constitutional violation], without a showing of direct responsibility for the action, will not subject an officer to liability." *Id.* (quoting *Ghandi v. Police Dep't of Detroit*, 747 F.2d 338, 352 (6th Cir. 1984)). To hold an individual officer liable for the use of excessive force, the Coles must show that the officer "(1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997).

### 1. Officers Villemaire and Michalski

Officers Villemaire and Michalski were the first responding officers from the Dearborn Police Department. Taking the facts as the Coles have plead them, the Coles have shown that both Villemaire and Michalski fit into the first prong of our analysis. Alan Cole alleged that, toward the beginning of the encounter, one officer was stepping on his neck, and when his brother alerted the officers that Alan could not breathe, another officer drove his knee into Alan's back in order to handcuff him. Although Alan could not identify which officer engaged in what behavior, Defendants claim that, at that point, "Villemaire provided cover and Michalski began handcuffing the suspects as they lay on the ground." Appellant Br. at 7. This allows the inference that Villemaire

could have stepped on Alan's neck while Michalski drove his knee into Alan's back to handcuff him. Further, Vincent Cole claims that one of these two officers intentionally stepped on his hand and ground it into the cement. It can be reasonably inferred that this alleged display of force could have been committed by either Villemaire or Michalski.

Construing the facts in the light most favorable to the Coles, it could be inferred that both the handcuffing officer and the cover officer were directly involved in the excessive force that was allegedly applied to them. In *Binay*, we held that plaintiffs had raised a genuine issue of material fact as to whether a defendant officer—who could not be identified by plaintiffs but was present and could have been involved in the application of excessive force—was personally involved in the Fourth Amendment violation. 601 F.3d at 651. Because the evidence indicates that the handcuffing and cover officers were Villemaire and Michalski, respectively, a reasonable juror could find that both Villemaire and Michalski were personally involved in the alleged excessive force.

At a minimum, even if Officer Michalski was only involved in handcuffing and all allegedly excessive force could be attributed to Officer Villemaire, then Michalski would still have a duty to intervene to protect the Coles from excessive force under these facts. Generally, a police officer may be held liable for failure to intervene in the face of excessive force when "(1) the officer observed or had reason to know that excessive force would be or was being used; and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Turner*, 119 F.3d at 429 (citing *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). Here, even if the record provided sufficient information to differentiate between the actions of the cover officer and the handcuffing officer, Michalski had reason to know that force was being applied, and had the opportunity and means to

stop his partner from engaging in further force. Thus, even if Michalski did not actively participate in the application of force, he at least acquiesced to the alleged force, and is not entitled to summary judgment.

### 2. Sergeant Conrad

The facts set forth by the Coles lack any allegation that Sergeant Conrad was present at the time of the alleged application of excessive force. The Coles claim that a number of additional, unidentified Dearborn Police Department cars arrived to the scene at some point during their stop. But the Coles do not specify the precise time at which they allege that Conrad arrived. Further, the Coles do not challenge Sergeant Conrad's assertion that, by the time he arrived on the scene, all alleged application of force had concluded. In fact, the Coles' brief concedes that Conrad arrived after officers Michalski and Villemaire. The record shows that Conrad did supervise officers Villemaire and Michalski, but only by (1) ordering a search of the premises for the gun that was used in the armed robbery; and (2) having the victims of the armed robbery come over and try to identify the suspects. None of these activities happened during the alleged application of force. Thus, Conrad was neither personally involved in, nor did he supervise the application of, the alleged excessive force.

Once again, in order to be liable for failing to protect the Coles, Sergeant Conrad must have either observed or had reason to know of the force, and have had the opportunity to intervene. *Turner*, 119 F.3d at 429. Here, the facts, even construed in the light most favorable to the Coles, show neither that Sergeant Conrad knew of the force nor that he had the ability to stop it. It follows that Conrad cannot be held liable on these facts, and is entitled to summary judgment.

### III. CONCLUSION

For the foregoing reasons, the decision of the district court is **AFFIRMED** in part and **REVERSED** in part. We **REMAND** to the district court for further proceedings in conformity with this opinion.