**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0996n.06

**No. 12-2601**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

GRANT TONER,

      Plaintiff-Appellant,

v.

VILLAGE OF ELKTON and
SCOTT JOBES,

      Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN

Before: BOGGS, CLAY, and GILMAN, Circuit Judges.

BOGGS, Circuit Judge. On October 19, 2008, Plaintiff-Appellant Grant Toner ("Toner" or "Plaintiff") was arrested for driving under the influence of alcohol. On March 1, 2011, Toner commenced this action under 42 U.S.C. § 1983, alleging that arresting officer Scott Jobes, Chief of Police of the Village of Elkton ("Jobes" or "Defendant"), used excessive force in effectuating Toner's arrest, in violation of Toner's Fourth Amendment rights, and that a policy of the Village of Elkton was also responsible for Toner's damages. The district court dismissed Toner's claim against the Village of Elkton, and Toner does not contest its dismissal. The district court also granted summary judgment with respect to Toner's excessive-force claim against Jobes. Toner appeals the district court's grant of summary judgment.

The district court granted summary judgment after determining that Toner's version of events was "blatantly contradicted by [the] video and audio [recordings] associated with his arrest, along with the other information from the record." *Toner v. Vill. of Elkton*, No. 11-10835, 2012 WL 4748057, at *6 (E.D. Mich. Oct. 4, 2012). On appeal, Toner argues that the district court erred when it "disregarded all of Plaintiff's factual allegations, even though the incident forming the core of Plaintiff's complaints occurred out of view of the video camera." Plaintiff-Appellant's Brief at 5. We agree with Plaintiff that the district court's statement that the record "blatantly contradicted" Plaintiff's account was erroneous. Nevertheless, we hold that Plaintiff's allegations, even if proven, would not make out an excessive-force claim in violation of Plaintiff's Fourth Amendment rights. Accordingly, we affirm the district court's grant of summary judgment.

# I

On October 19, 2008, Toner, who had been drinking during the afternoon and into the evening, went to a local bar with his friend, Marty Burzyk, to pick up some food for Toner's son, who had been working on Burzyk's farm. Toner had "a couple beers" at the bar, and he and Burzyk headed back to the farm in Toner's Ford pickup truck.

Around that time, Jobes, who was on patrol duty in his police cruiser, was approached by a motorist claiming to have almost been struck by an "older blue Ford diesel pickup." The motorist said that the driver of the pickup yelled at him and appeared to be slurring his speech. The motorist informed Jobes that the truck was at a nearby gas station, and Jobes went to investigate. When he arrived, Jobes saw a blue truck pull out of the station and turn north onto Main Street. The truck was Toner's. As Jobes followed, he "paced" Toner at ten miles-per-hour

2

over the speed limit. Jobes then saw Toner turn left onto Marx Road in front of another car coming in the opposite direction. Jobes turned on his emergency lights and pulled Toner over.

When Jobes turned on his emergency lights, his dashboard camera was engaged. The camera captures activity in front of Jobes's cruiser, and it includes microphones that record any accompanying audio. As shown by the audio and video, Jobes approached Toner's vehicle and asked for his license, registration, and insurance information. Jobes wrote in his report that he noted a strong odor of alcohol coming from the vehicle. Jobes asked Toner whether he had been drinking. Toner responded, "A little bit." When Jobes asked how much, Toner replied, "A couple beers." Jobes then asked Toner to turn off his engine and step out, which Toner did.

After asking a few more questions, Jobes reported Toner's information to the dispatcher and indicated that he planned to conduct a sobriety test. As shown on the video, Jobes then took Toner through a number of sobriety tests. Toner wobbled back and forth as he attempted to take sixteen steps, touching heel-to-toe each time. He could not balance on one foot for more than a few seconds. Jobes then asked Toner to recite the alphabet stopping at the letter S, which Toner was able to do without difficulty. Finally, Jobes conducted a preliminary breath test, which indicated that Toner's blood-alcohol level was .166—just over twice the legal limit. At that point, Jobes informed Toner that he would be placing him under arrest. Toner cooperated. Jobes handcuffed Toner's hands behind his back, and asked if the cuffs were too tight. Toner responded, "No." Jobes searched Toner's pockets, confiscated his jack-knife, and led Toner to the side of the cruiser, which was outside the camera's view.

The audio continued recording. As Jobes walked Toner to the side of the cruiser, Toner complained, "The left cuff is awful tight." Jobes told Deputy Todd Schember, who had just

3

arrived on the scene, to get his flashlight. Jobes loosened the cuff and asked, "Is that good?" and Toner responded, "Yeah."

What happened next is disputed: According to the audio, Jobes opened the back door of the cruiser and asked Toner to have a seat inside. Jobes said, "It's kind of a tight squeeze." Toner responded, "K," and could be heard entering the vehicle, breathing rather heavily and grunting a couple of times. At the same time, Jobes told Toner, "If you'll feel more comfortable, you can put your back, like, that way and put your legs up." Jobes then said, "A little more. Okay?" Toner responded, "K," and Jobes shut the back door with a final "alright." About twenty-five seconds elapsed from the time Jobes opened the back door to the time he closed it with Toner inside. Jobes can be heard chewing gum the entire time. No other sounds were recorded.

According to Toner, after Jobes opened the car door, two things happened. First, Toner claims that Jobes banged Toner's head against the doorframe as he tried to put him into the vehicle, knocking Toner's hat off. Allegedly, Jobes then laughed and said: "Do you really want that hat?" He then returned the hat to Toner. Toner acknowledges that the incident is not captured on the audio. Second, Toner alleges that, when Jobes was "put[ting] [him] in the car," Jobes lifted up the chain of Toner's handcuffs, tilting Toner forward and popping his shoulder, causing Toner severe pain.

Jobes testified that he did not recall whether or not Toner banged his head in the process of getting into the police car, whether Toner's hat came off, or whether Jobes made a comment to him about the hat. In addition, Jobes did not recall having had any physical interaction with Toner as Toner was entering the vehicle.

Jobes returned to the truck, where Marty Burzyck was waiting, and he gave Burzyk permission to walk down to the field to find Toner's son, so that Toner's son could retrieve the truck. Jobes then took Toner to the Huron County Jail, where Toner was booked and housed for the night. As the district court noted, nothing in the booking records, including Toner's intake photograph, medical screening records, and interview report, indicates any sign of head injury or trauma. The standard interview protocol at the police station included a question about whether Toner had recently experienced a head injury. When asked that question, Toner responded, "No."

Toner was then taken to a local hospital to have his blood drawn, pursuant to a search warrant that Jobes had obtained to test for alcohol. Toner entered and exited Jobes's cruiser on his own and without incident. The next day, Toner was released, and he eventually pleaded guilty to operating a vehicle while intoxicated.

A few days or a week after his arrest, Toner went to see his doctor about pain in his shoulder. He was sent to get an MRI and referred to Dr. McManaman, who informed Toner that he had a one-inch tear in his rotator cuff. Toner asked Dr. McManaman if the injury could occur from having one's arms lifted up from behind while handcuffed. Dr. McManaman said that that was possible. Dr. McManaman told Toner he could also have been injured while lifting heavy objects, lifting objects over his head, or even from falling down.

Over two years later, on March 1, 2011, Toner filed his complaint, alleging that Jobes "needlessly and repeatedly dragg[ed] [him] by his arms while handcuffed; pull[ed] forcefully on [his] arms while they were handcuffed behind his back, tearing [his] right rotator cuff; and otherwise consistently us[ed] unnecessary and excessive force in effectuating the arrest and

5

transporting [him]." On October 4, 2012, the district court granted defendants' motion for summary judgment.

## II

We review the district court's grant of summary judgment de novo. *Frazier v. Honda of Am. Mfg., Inc.*, 431 F.3d 563, 565 (6th Cir. 2005).

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986). Generally, courts must draw all justifiable inferences from the evidence in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). But "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

In *Scott*, a § 1983 case arising out of a high-speed police chase, plaintiff claimed that his driving did not endanger the lives of others, so that defendant's actions—bumping plaintiff's car off the road to disable it, rendering plaintiff a quadriplegic—were not justified and therefore constituted excessive force in violation of the Fourth Amendment. *Id.* at 378–79. The court found that a videotape recording of the events thoroughly discredited plaintiff's account. *Id.* The videotape showed plaintiff driving at "shockingly fast" speeds and "swerv[ing] around more than a dozen other cars." *Id.* In light of the videotape, the Court rejected plaintiff's claim, which

6

had been adopted by the court of appeals, that "there was little, if any, actual threat to pedestrians or other motorists." *Id*. at 378. The Court held that plaintiff's "version of events" should not be credited where "a videotape capturing the events in question . . . quite clearly contradicts [plaintiff's] version of the story." *Id*. To be sure, the *physical* facts in *Scott* were not in dispute—"[t]here [were] no allegations or indications that [the] videotape was doctored or altered in any way, nor any contention that what it depict[ed] differ[ed] from what actually happened." *Id.* Rather, the crux of the dispute lay in the parties' *characterization* of those physical facts. *See Romo v. Largen*, 723 F.3d 670, 679 (6th Cir. 2013) (Sutton, J., concurring) (observing that "[t]he details of Harris's driving were not in dispute; the video laid those to rest. What mattered were the inferences those details could support: Was Harris driving *safely*?") (emphasis in original).

This court has also applied *Scott* to situations in which the underlying facts were themselves in dispute. For example, in *Griffin v. Hardrick*, 604 F.3d 949, 956 (6th Cir. 2010), we upheld the district court's decision not to credit plaintiff's claim that she never resisted the corrections officers who were trying to apprehend her, where "the video clearly show[ed] [plaintiff] resisting the officers' efforts." *See also Coble v. City of White House*, 634 F.3d 865, 869 (6th Cir. 2011).

On the other hand, where plaintiff's testimony is only partially contradicted by audio and video recordings, "that does not permit the district court to discredit his entire version of the events." *Coble*, 634 F.3d at 870. In particular, the absence of corroborating evidence on a recording does not necessarily "blatantly contradict" plaintiff's version of events. *Id.* In *Coble*, plaintiff fractured his ankle after the police executed a "take-down maneuver" to apprehend him. *Id.* The reasonableness of the takedown was not disputed. Plaintiff claimed, however, that he

7

screamed at his arresting officer and "called [him] names" to get the officer to stop walking plaintiff back to the officer's vehicle due to the pain plaintiff suffered from his fractured ankle. *Id.* at 866–67. Plaintiff further alleged that, when the officer finally stopped, the officer dropped plaintiff face-first onto the concrete. *Id.* No shouts, name-calling or other sounds corroborating these claims were audible on the audio recording. *Id.* We held that "the lack of any audible screams or name-calling on the recording" and the absence of "audible noise that once [*sic*] could associate with a body dropping or 'splattering' to the pavement . . . [could not] be reliably used to discount Coble's testimony." *Id.* at 869 (internal citations and quotation marks omitted). We therefore held that the district court had erred in granting summary judgment to the defendants.

Similarly, in *Dixon*, where plaintiff claimed to have been choked off-camera "when he was lying face down on the ground after having been subdued," we agreed with the district court that "the video recording neither prove[d] nor disprove[d] Dixon's claim." *Dixon v. Cnty. of Roscommon*, 479 F. App'x 680, 682 (6th Cir. 2012) (per curiam). Accordingly, summary judgment was not appropriate.

## A

Here, the district court recognized that "a court need not adopt a plaintiff's version of events if they are blatantly contradicted by the record, so that no reasonable jury could believe it." *Toner*, 2012 WL 4748057, at *10. The court held that "[i]t [was] not simply the lack of sound recorded on the audio, but also what was recorded, that blatantly contradict[ed] Plaintiff's allegations." *Id.* Although the district court's statement of law was correct, the court appears to

8

have misconstrued the nature of Plaintiff's allegations. As a result, its conclusion that they were blatantly contradicted by the record was unwarranted.

The district court somewhat overstated Toner's allegations in this case. As the district court framed it in denying Toner's motion for reconsideration, "Plaintiff says Defendant wrenched his arms into the air and tore his rotator cuff before any other officers arrived on the scene. Plaintiff says Defendant smashed his head into a police car, knocked his hat to the ground, and then unceremoniously threw him into the backseat. Plaintiff says all the while Defendant disrespected and taunted him, laughed, and was just plain mean." *Toner*, 2012 WL 5947605, at *1.

The district court is correct that, based on the video and audio recordings showing a calm and uneventful arrest, the absence of any indication or notation of head trauma when Toner was examined at the station, and all the other evidence in the record, any claim that Jobes beat him up and "abused" him off-camera would be "blatantly contradicted" by the record. *Toner*, 2012 WL 4748057, at *4 (stating, "Plaintiff claims that he was abused . . . . "). Moreover, Toner's deposition testimony as to what occurred reflects far less extreme conduct on the part of Jobes than what Toner alleges in his complaint. Toner said in his deposition that Jobes banged Toner's head against the doorframe *while Jobes was in the process of putting Toner into the car*. Toner does not contend that Jobes banged Toner's head in a separate incident. While Toner at one point claimed that Jobes "knocked the shit out of him" when he banged Toner's head on the car door, and claimed that Jobes did so deliberately, Toner's overall description of events is more indicative of carelessness, and what Toner calls "unprofessional" behavior, than it is of wanton abuse:

Q.     And how does he put you in the car?

9

A. He banged my head on the door and knocked my hat off. I had a Ford racing hat on.

Q. Okay.

A. Do you really want that hat, he says, and he laughs.

***

Q. Can you explain to me how he banged your head on the car? He's putting you in, and your head hits the top as you're—as he's putting you in the car?

A. He's got—he's got my hand cuffed behind my back, and he's got ahold of the handcuffs.

Q. Mm-hmm.

A. Well, I'm a pretty good-sized guy. It's hard for me to get in this car, right.

Q. Mm-hmm.

A. So he's trying to help, and he's pulling me up, pulling my weight off of balance, you know.

***

Q. Okay. What happened to the hat?

A. He picked it up and gave it to me.

The district court's account makes it sound as though Toner were claiming that Jobes essentially attacked him off-camera. Based on our review of the record, that is not a fair characterization of Toner's allegations. To the extent that Toner does in fact allege that Jobes's behavior was "malicious"—a word Toner uses only once in his deposition—we agree with the district court that, in light of the recordings, such an allegation cannot withstand scrutiny. But we cannot say that the balance of Toner's allegations are "blatantly contradicted" by the record. In addition, Toner does not purport to be holding Jobes accountable for banging his head:

Q. So it's your shoulder, and your head, and your back?

A. He just banged my head. You know, big deal.

Q. Banged your head, okay.

A. Big deal. I felt pain in my shoulder and my back.

Q. All right. So he banged your head, what's the big deal?

A. Yeah.

10

Q. Okay. And you already said you're not holding him accountable for the back?
A. No. Sure ain't.
Q. Are you holding him accountable for the bang of the head?
A. No.
Q. No?
A. No.
Q. Just the shoulder?
A. Just the shoulder.
Q. All right. So the banging of the head, intentional/unintentional, you're not holding him accountable?
A. Unprofessional.
Q. Fine. But you're not—you're not alleging any force because of that?
A. No.

The district court evidently believed that, had Jobes really banged Toner's head, Toner would have reported it "at the police station, at the hospital, or during his hearing before Judge Knoblock," at which he pleaded guilty to operating a vehicle under the influence of alcohol. *Toner*, 2012 WL 4748057 at *9. But given that Toner does not appear to have considered the banging of his head a "big deal," it is conceivable that he would not have reported it. Regardless, since Toner abandoned his excessive-force claim based on this incident, whether the incident actually took place is irrelevant.

The court next addressed the crux of Toner's claim, namely, that as Jobes helped Toner into the vehicle, with Toner's hands cuffed behind his back, Jobes lifted up on the handcuff chain, causing Toner's shoulder to pop, tearing his rotator cuff and causing him extreme and enduring pain. Again, the district court found that the record blatantly contradicted Toner's version of events:

Plaintiff alleges that Defendant wrenched back on his arms, tearing his rotator cuff. He claims he heard a pop, and experienced "extreme pain." No pops were recorded on the video tape. No cries of pain from someone in "extreme pain." Finally, Plaintiff claims Defendant shoved him into the car sideways. Again, the audio contradicts this claim. The audio confirms Defendant told Plaintiff, "If you'll feel more comfortable you can put your back, like, that way and put your

11

legs up." After he was situated in the car, Plaintiff audibly responded, "K," and then Defendant shut the back door. Both Defendant and Deputy Schember testified Plaintiff got into the car on his own.

*Toner*, 2012 WL 4748057 at *7 (citations omitted).

The district court believed that the record "blatantly contradicted" Toner's story. But a shoulder "pop" is not the kind of sound that would necessarily have been picked up by a nearby microphone, and not everyone screams when experiencing pain. Indeed, it is plausible that Toner—an army man who worked as a military police officer for over a decade—would not inevitably have cried out in pain when his shoulder was injured. Indeed, Toner never testified that he cried out. The court did not credit Toner's claim that Jobes in fact physically touched Plaintiff, but conflicting testimony of this sort, which the video and audio recording and surrounding circumstances could neither prove nor disprove, cannot be said to be "blatantly contradicted" by the record. That is particularly true here, where Jobes testified that, although he did not believe that he touched Toner, he did not recall for certain, and he did not remember one way or the other whether Toner banged his head. The court also relied on Deputy Schember's claim that Jobes did not help Toner into the car, even though Jobes testified that when he asked Schember about the incident, Schember could not recall the stop.

Finally, the district court concluded that Toner's failure to "tell anyone about his injuries" undermined his testimony. *Toner*, 2012 WL 4748057 at *4. The court cited Toner's claim that he did not do so because "they're all in cahoots, and they're all buddies and pals. They all go drinking. They all go bowling together. Why would I say anything to them?" *Id.* Out of context, Toner's testimony may sound outlandish. In context, however, Toner's claim—that he did not believe it would have been fruitful to complain about the police chief to the local judge or other members of law enforcement—could be plausible:

12

Q. Do you understand that it's not police officers that decide whether or not somebody is going to be charged with a crime?

A. Do you understand where you're at in Huron County, out in the middle of nowhere?

When asked why he did not complain of his shoulder pain at the hospital when they were drawing his blood, Toner testified, "I thought it would go away. I didn't think it was a big deal."

We cannot say either that Toner was obviously lying as to his own subjective beliefs or that Toner's beliefs were so far-fetched that his entire testimony should be discredited. Accordingly, the district court should not have rejected Toner's version of events on that basis.

**B**

Although Toner's allegations were not "blatantly contradicted by the record, so that no reasonable jury could believe [them]," *Scott*, 550 U.S. at 380, they nevertheless suffer from a shortcoming that is equally fatal: they fail to make out a claim that Jobes violated Toner's clearly established Fourth Amendment rights. Aside from the allegations of malice on Jobes's part, we do not wholly discredit Toner's version of events. Rather, we hold that, even had Jobes actually behaved as alleged, his behavior would not have risen to the level of "excessive force," in violation of Toner's Fourth Amendment rights.

A claim that a police officer used excessive force in effectuating an arrest is evaluated under "an objective-reasonableness standard, which depends on the facts and circumstance of each case viewed from the perspective of a reasonable officer on the scene." *Coble*, 634 F.3d at 868 (citations and internal quotation marks omitted). "[O]nce a suspect is passively complying with an officer's commands, that suspect has a clearly established right to be free from force beyond what is necessary to carry out the arrest." *Cole v. City of Dearborn*, 448 F. App'x 571, 576 (6th Cir. 2011). "Cases in this circuit clearly establish the right of people who pose no

13

safety risk to the police to be free from gratuitous violence during arrest." *Id.* "In determining whether there has been a violation of the Fourth Amendment, we consider not the extent of the injury inflicted but whether an officer subjects a detainee to gratuitous violence." *Miller v. Sanilac Cnty.*, 606 F.3d 240, 252 (6th Cir. 2010) (citations and internal quotation marks omitted). On the other hand, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* at 253 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal citations omitted)).

Plaintiff alleges that Jobes used excessive force in effectuating Toner's arrest. In particular, he alleges that Jobes "gratuitously yanked up and back on Toner's handcuffed arms, causing Toner to feel a 'pop' in his right shoulder and experience extreme pain." Appellant's Br. at 3.

Insofar as Plaintiff intends to allege anything that might be considered "gratuitous violence" on the part of Jobes, we agree with the district court that such a claim must be rejected as blatantly contradicted by the record, including the accompanying audio and both Toner's and Jobes's depositions. Insofar as Plaintiff intends to allege inadvertent "excessive force" of the kind elaborated upon in Plaintiff's deposition—essentially, that Jobes assisted Toner into the vehicle even though his assistance may not have been necessary, and that in the process, Jobes lifted up on Plaintiff's handcuffs, tearing Plaintiff's rotator cuff and causing him extreme pain— Plaintiff fails to allege a Fourth Amendment violation.

We judge whether Jobes's behavior was objectively reasonable in view of the facts and circumstances of the case. Since Toner was handcuffed and at no point resisted or indicated an intent to resist arrest, he had a clearly established right to be free from gratuitous violence. But Toner was not subjected to gratuitous violence and cannot plausibly allege otherwise. The video

14

reveals that Toner, though not, as Toner put it, "obliviated," was visibly intoxicated, and that he failed two of three sobriety tests before testing at over twice the legal limit in the preliminary breath test. Toner also conceded: "I'm a pretty big-sized guy. It's hard for me to get in this car, right. . . . So [Jobes is] trying to help, and he's pulling me up, pulling my weight off of balance." Under the circumstances, even assuming that Jobes physically assisted plaintiff into the car without his consent, and that in doing so, Jobes caused Toner's rotator cuff to tear by tilting Toner forward "off of balance" into the car, Jobes's behavior was not objectively unreasonable, and would not constitute the use of excessive force.

Plaintiff points us to no case—and we are not aware of any—holding, for example, that the Fourth Amendment requires police officers to allow arrestees, particularly intoxicated ones, the opportunity to enter police cars unaided or untouched before officers provide assistance. And we are aware of no case that imposes such a low bar for establishing a claim of excessive force. Nor are we aware of any case holding that what is, at most, a police officer's negligence in assisting an arrestee into a vehicle constitutes excessive force.

In *McColman v. St. Clair Cnty.*, 479 F. App'x 1, 6–7 (6th Cir. 2012), this court confronted a situation that is somewhat similar to the case at bar:

> The [district] court acknowledged that [Plaintiff] McColman did not actively resist arrest and that the manner in which [Officer] Doan pulled her into the car caused her prosthetic leg to fall off and caused bruising on her arms. However, the district court concluded that Doan's pulling McColman into the back seat was not objectively unreasonable because his previous encounter with her after her domestic dispute apprised him of her aggressive behavior, and he had to use some force to get a woman of her weight into the police vehicle. Doan did not use "gratuitous violence" or "gratuitous force" to get McColman into the car. The court also concluded that even if Doan's use of force was objectively unreasonable, he was entitled to qualified immunity.

We held that "[t]he district court's analysis [was] sound." *Id.* at 7.

15

The circumstances in this case are somewhat different, and Toner admittedly had no prior history with Jobes. But here an even lesser degree of force was alleged. *McColman* hardly suggests that, under the circumstances here, Toner had a right to be free from physical contact, even if such contact could and did cause him harm. We hold that, even if Jobes behaved as alleged, his behavior would not give rise to a Fourth Amendment violation. Since there was no Fourth Amendment violation, we need not reach the question whether Jobes is entitled to qualified immunity.

### III

Although we agree with Plaintiff that the district court should not have found that Plaintiff's version of events was blatantly contradicted by the record, we find that, regardless, Defendant's alleged behavior would not have constituted excessive force in violation of the Fourth Amendment. We therefore AFFIRM the judgment of the district court.